NOT DESIGNATED FOR PUBLICATION

No. 126,889

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of J.J., a Minor Child.

MEMORANDUM OPINION

Appeal from Riley District Court; JOHN BOSCH, judge. Submitted without oral argument. Opinion filed December 20, 2024. Affirmed.

*Jennifer Martin Smith*, of Alderson, Alderson, Conklin, Crow & Slinkard, L.L.C., of Topeka, for appellant natural father.

*David Lowden*, deputy county attorney, and *Barry R. Wilkerson*, district attorney, for appellee.

Before CLINE, P.J., MALONE and BRUNS, JJ.

PER CURIAM: Father appeals the district court's termination of his right to parent J.J. (YOB: 2019). He argues on appeal that (1) the district court erred in taking judicial notice of the social file at the hearing, (2) there was insufficient evidence to support the district court's findings of unfitness, (3) the district court erred in finding that Father's unfitness was based on conduct or conditions unlikely to change in the foreseeable future, and (4) the district court abused its discretion in finding that termination was in the best interests of the child. Mother appeals separately. After thoroughly reviewing the record, we find no reversible error and affirm the district court's judgment.

FACTUAL AND PROCEDURAL BACKGROUND

On June 12, 2021, at 5 a.m., Riley County Police Officer Beaubien was dispatched to the Super 8 Motel in Manhattan. Mother was in the lobby, intoxicated and screaming

while holding a naked J.J. The motel clerk had called police. Mother's screaming and cursing continued until the clerk asked police to arrest her for criminal trespass. Mother agreed to get her belongings from her motel room, but had difficulty carrying J.J. up the stairs, putting the child on her head in an unsafe manner.

Outside the motel room door police noticed two 12-ounce bottles of beer on the floor. Inside the room they found cigarette butts all over the floor and an open bottle of whiskey with a missing lid. Toys and grapes were strewn on the floor. Mother refused to identify herself, but police found a pill bottle on the motel room floor with her name on it. Mother refused officers' requests to clothe the child and gather her belongings. Beaubien handcuffed Mother, and officers put her in the back of a patrol car. She was arrested for criminal trespass, child endangerment, and disorderly conduct. J.J. was placed into police protective custody.

At the temporary custody hearing on June 16, 2021, the district court placed J.J. in the custody of the Secretary of the Department for Children and Families (DCF) in out-of-home placement. The district court ordered Mother to obtain a drug and alcohol evaluation and submit to random urinalysis testing. The district court also ordered Mother to pay child support at $25 per month.

An amended petition was filed on July 7, 2021, naming Father for the first time. J.J. was adjudicated a child in need of care (CINC) on July 21, 2021, but Father was not served properly. The initial case plan goal was reintegration. A case manager and family support worker went over the case plan and intake paperwork with Father on August 3, 2021. On November 10, 2021, the district court held an adjudication hearing as to Father. Father submitted a statement of no contest to the amended petition.

A permanency hearing was held on May 25, 2022. Father did not appear. The district court found that reintegration continued to be a viable goal. Another permanency hearing was held September 19, 2022, and continued to October 24, 2022. At that time, the district court found that reintegration was no longer viable.

The State filed an amended motion to terminate Mother's and Father's rights on November 29, 2022. The district court held a trial over three days on the State's amended motion:  March 8, 2023; June 9, 2023; and July 7, 2023. A summary of the evidence presented, as it pertains to Father, follows.

Elena Zocca, case manager with Saint Francis Ministries (SFM), the agency appointed to provide case management for CINC cases, testified for the State. It was her job to go over case plan tasks with the parents and help them complete them. Father's case plan tasks included:  remaining in contact with SFM; signing all necessary releases; working with the intake worker for the first 90 days; maintaining clean and stable housing; maintaining stable employment; participating in parenting class; participating in the Infants and Toddlers program and then the Parents as Teachers program; completing a mental health evaluation and following all recommendations; and completing a drug and alcohol evaluation and following all recommendations.

Zocca testified that communication with Father was a struggle at first, but that he progressed throughout the case. She stated that he signed all releases and worked with the intake worker for the first 90 days. She testified Father had not maintained stable housing throughout the case. He was living in a motel in Junction City when the case began.

Father's lack of long-term employment was also a concern for the agency. Zocca stated that he was "constantly changing different jobs." The evidence showed that he worked at seven jobs in the first year of the case. Father worked at I-Hop in October

3

2021, then he worked at a motel, and then a company called Florence in December 2021. Father notified the case team on January 10, 2022, that he had a new work schedule at Russell Stover's. From March 6, 2022 to March 18, 2022, he worked at Domino's Pizza. He was terminated after failing to call in or show up for two shifts. By the end of July 2022, Father worked for Footlocker. Then in August 2022 he was working for PENN Enterprises. He was terminated after one month for "ncns x 2," presumably meaning he failed to call in or show up for two shifts. Father started working for JC's BBQ & Grill on October 25, 2022. At the time of the termination hearing in March 2023, he had been working at JC's BBQ for just over four months.

It took Father over a year to enroll in a parenting class, and he never completed the Infant and Toddlers program with J.J. Zocca stated that she provided a referral for Father to the parenting class in August 2021 and again in July 2022, but he did not enroll. She never received a certificate of completion from Father. At the time of the termination hearing, Zocca stated that Father had started a parenting class. A schedule of the parenting class was admitted into evidence and showed classes scheduled from January 25 through March 22, 2023. Zocca testified that J.J. aged out of the Infant and Toddler program with Father never having participated.

Zocca testified that SFM provided Father with an application for housing assistance, food assistance, and a bus pass as early as September 2021. But Father testified he did not have any resources or guidance and had to figure everything out on his own. It took Father over a year to complete the mental health evaluation and drug and alcohol evaluation. The evaluator recommended that Father continue with therapy, but Father did not comply, stating he could not afford it.

Father's visitation with J.J. was once a week, with monitoring by SFM. Zocca testified that the frequent changes in his work schedule affected visitation. And at times

4

he canceled the visitation with no notice or without confirmation until the last minute. Father's visits never progressed to overnight. Father's apartment as of the commencement of the termination hearing did not contain a bed for J.J., or even space to put a child's bed.

During Zocca's testimony, the State asked the district court to take judicial notice of the official file and the social file, including all agency reports from DCF, SFM, and the court appointed special advocate (CASA). Mother's counsel objected on the ground that the court reports contained hearsay. The district court overruled the objection and took judicial notice of the files. Later in Zocca's testimony, Mother's counsel renewed her objection to "all the judicial notice" the district court had taken, including the records in the social file and the pleadings in the official file, stating there were "hearsay and due process issues." Father's counsel joined in the renewed objection. The district court noted the objection.

Emily Selby, J.J.'s CASA, testified that she was appointed to advocate for J.J. in January 2022. She never observed any interactions between Father and J.J., and she never met or talked to him. She stated that visitation between Father and J.J. was inconsistent and that Father did not seem to be a large part of the case when she was appointed.

Jenifer Nichols, an intake worker/parent support for SFM, testified that she worked with the parents for the first 90 days of the case. She met with Mother on June 18, 2021 and sought to get information about Father. Mother did not have a phone number or address for him, but she provided a name and a city where she believed he lived, stating that he had not been in J.J.'s life since she was six months old. At some point Nichols got an address for Father and put a letter on his door. It was at the end of the 90 days that she first heard from him.

Amanda Easton, a permanency specialist with SFM testified that she was assigned to work this case from February 2022 to May 1, 2022. During those three months she stated that Father had more than one job. She described his contact with SFM as "[s]poradic and inconsistent" and his visitation with J.J. as "inconsistent." She testified that "there were multiple occasions . . . where he would confirm [a visit] the day before and not attend the day of." Easton said Father did not communicate as to why visits were being missed. Easton testified that during those three months Father never confirmed his physical address. She could not approve Father's home for visitation because she did not know where he lived. Easton was able to speak with Father around March 1, 2022, when he told her that he had been in Japan for two weeks during February 2022.

Paige Gottwald, a case manager at SFM, testified that she was assigned to the case from February to April 2023. She met with Father on February 16, 2023. Gottwald testified that Father was struggling at that time with a roommate or landlord problem and a job problem. Father said to her that he was looking for a low-income apartment. Gottwald met with Father again on March 28, 2023, when Father stated he had been staying in a homeless shelter but was still on a list for low-income housing. He remained in the homeless shelter on April 17, 2023. Gottwald testified that Father told her that marijuana helped with his stress.

Rebekah Castle worked this case for SFM for its entirety, except for the three months from February 2022 to May 2022 when it was reassigned to a different team, initially as an intern and then as a family support worker. She compiled a timeline of the parents' visitation with J.J. Based on her notes, Father cancelled visitation 26 times between August 30, 2021, and September 23, 2022; some for illness, some for work conflicts, and some without any notice or reason.

Castle testified that Father did not have permanent housing in October 2021. He was living at the Budget Inn at that time. Castle testified that in May 2023 Father was living in the homeless shelter, but by June 1, 2023, he had a new residence. Castle also testified that Father completed his parenting class, albeit after termination proceedings had begun. She said he had been stable for the past six months, but for the first year and a half of the case his inconsistency prevented him from reintegrating. Castle testified that, ultimately, she did not think reintegration was viable.

Father testified on his behalf on June 9, 2023. He stated that he had been at his current residence since June 1, 2023. Father testified that when the case was initiated, he was living at the Budget Inn motel. He said he could not afford a car. Father testified that he makes $13.88 an hour but should soon get $14.88 an hour. He stated that if he gets custody of J.J. he has pre-arranged for a babysitter. When asked about therapy, Father replied, "[I]nstead of going to therapy I found out that just going to the gym and working it out works better than that for me."

Father could not recall J.J.'s birthdate when asked. He testified that he was dating Mother three or four months before her pregnancy, and they talked about a pregnancy and planned it. Then he and Mother broke up two or three months before J.J. was born. Father said he visited J.J. two weeks after she was born. Father testified that Mother would bring J.J. to his house and the three of them would spend time together. He admitted that he never provided any support, money, diapers, or formula to Mother to provide for J.J. He described his bond with J.J. as, "Slow but it's getting better."

Father testified that he has another child, a 10-year-old girl. His child support of $400 a month is automatically deducted from his paycheck. He does not see that child.

7

J.J.'s foster placement, E.W., testified that J.J. refers to Father as "the guy with the sucker" and recently also by his first name. E.W. testified that J.J. was very excited on days when she was scheduled to visit Mother and that "[s]he has less enthusiasm" for visiting Father. E.W. was J.J.'s placement for two years since the case began.

At the conclusion of testimony on June 9, 2023, the district court ordered visitation to remain supervised for one hour each week until the parties reconvened on July 7, 2023, for closing arguments and a decision on the matter.

On July 7, 2023, the district court noted that J.J. had been in state custody close to 25 months. It noted that before the case was filed, Father had no relationship with J.J. The district court acknowledged that "since the petition for termination of parental rights was filed, the parents have come around." The district court referenced Father's recently stable housing—Father had been in an apartment a little over a month at that time—and his employment with JC BBQ. The district court also stated, "The sad thing is that here we are now two years past the filing of this case and the father's been unable to get himself in a position where he can have an overnight stay with his child."

The district court ruled there was a "failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family." The district court reiterated that "the child never lived with the father, the child has never spent the night with the father, and he wouldn't have had contact with his child probably in the last past couple of years except for the efforts made by the agencies." The district court stated that "the failure to provide for stability and housing and a job until just recently [and] not being in therapy that was recommended and difficulty completing the parenting classes until the very end just shows to me a lack of priority on the father's part to step in and be a father." The district court found Father unfit under K.S.A. 38-2269(b)(7), (b)(8), (c)(1), (c)(2), and (c)(3). The district court also found that Father was presumed unfit under

8

K.S.A. 38-2271(a)(5) and (a)(13), and that he failed to rebut those presumptions. The district court also found that Father's conduct or condition was unlikely to change in the foreseeable future and observed that the court "should use child time as a measure." Finally, the district court found that it was in J.J.'s best interests for Father's rights to be terminated. Father timely appealed the district court's judgment.

## DID THE DISTRICT COURT ERR IN TAKING JUDICIAL NOTICE OF THE SOCIAL FILE?

Father first claims the district court erred in taking judicial notice of the social file during Zocca's testimony at the termination hearing, including the reports therein, because the reports contained hearsay statements. The State responds that Father has failed to adequately brief this issue and designate an adequate record for this court to determine whether the district court erred by taking judicial notice of the files.

An appellate court exercises de novo review of a challenge to the adequacy of the legal basis of a district judge's decision on admission or exclusion of evidence. *State v. Randle*, 311 Kan. 468, 476, 462 P.3d 624 (2020). Determining whether an evidentiary ruling "was contrary to the governing statute" raises a question of law reviewable de novo. *In re J.D.C.*, 284 Kan. 155, 162, 159 P.3d 974 (2007).

Father complains that the reports the district court took judicial notice of contained improper hearsay. K.S.A. 2023 Supp. 60-460(a) allows the admission of hearsay if it is "[a] statement previously made by a person who is present at the hearing and available for cross-examination with respect to the statement and its subject matter, provided the statement would be admissible if made by the declarant while testifying as a witness." Father fails to point to any one statement by any one person as constituting hearsay.

Father recognizes that a district court may take judicial notice of its own records under K.S.A. 60-409. But he takes issue with the reports contained within the social file.

9

Father cites *In re Ky.H.*, No. 114,508, 2016 WL 1079500, at *4 (Kan. App. 2016) (unpublished opinion), and argues that even though the social file may be part of the court's files, the court may not take judicial notice of the reports contained in the social file unless those reports were "previously" admitted into evidence. Father contends that seven documents in the social file were not previously admitted into the record:

1. June 17, 2021 DCF Report
2. July 9, 2021 DCF Permanency Plan
3. September 8, 2021 St. Francis Court Report (apparently referring to the report prepared on September 2, 2021 for the September 15, 2021 hearing)
4. November 10, 2021 St. Francis Addendum
5. January 11, 2022 DCF Permanency Plan
6. May 13, 2022 St. Francis Court Report
7. June 15, 2022 DCF Permanency Plan

There are two problems with Father's claim about the reports in the social file. First, it appears some of these documents were admitted into evidence at various hearings throughout the case. The June 17, 2021 DCF Report (filed on June 17, 2021 but dated June 16, 2021) was admitted into evidence at the June 16, 2021 temporary custody hearing, according to the journal entry of that hearing. The September 2, 2021 St. Francis Court Report was prepared for the September 15, 2021 hearing, but that hearing was continued and new reports were ordered for the next hearing. The November 10, 2021 St. Francis Addendum was admitted into evidence at the November 10, 2021 hearing, according to the journal entry of that hearing. The May 13, 2022 St. Francis Court Report was prepared for the May 25, 2022 permanency hearing, but a transcript of that hearing is not in the record on appeal. Because the termination hearing is the only transcript in the record on appeal, it is impossible to say whether the district court may have admitted any other of these court reports or permanency plans into evidence at other hearings. It is

10

Father's burden to designate a record sufficient to establish his claimed error. *Hill v. Farm Bureau Mut. Ins. Co.*, 263 Kan. 703, 706, 952 P.2d 1286 (1998).

Second, Father has misinterpreted the holding in *In re Ky.H.* The reason the court in *In re Ky.H.* did not rely on the social file in that case was because the district court did not admit it into evidence or take judicial notice of it *at the termination hearing*—there was no requirement that it must have been admitted at some earlier hearing. 2016 WL 1079500, at *4. But here, the district court took judicial notice of the social file at the termination hearing. *In re Ky.H.* simply holds that

> "no fact or conclusion derived from a report ordered by the court 'shall be used as the basis for an order of the court unless the information has been admitted into evidence following an opportunity for any party or interested party to examine, under oath, the person who prepared the report.'" 2016 WL 1079500, at *4.

Father fails to point to any statement in any of the identified reports that would amount to inadmissible hearsay. The three SFM court reports in the social file, that Father claims were never admitted into evidence, were prepared by Zocca and Easton, both of whom testified at the termination hearing and were cross-examined by Father's counsel. Even if facts or conclusions from the reports were used as the basis for the district court's order of termination, Father had an opportunity to cross-examine the persons who prepared the reports, which under *In re Ky.H.* would alleviate any concern. Without identifying which fact or conclusion, and what information in what report, was used by the district court for its order, it is impossible to tell whether the district court improperly took judicial notice of the social file. It is also impossible for this court to evaluate whether the improper admission of any evidence may have been harmless error. Issues not adequately briefed are considered waived or abandoned. *In re Marriage of Williams*, 307 Kan. 960, 977, 417 P.3d 1033 (2018). Thus, Father's claim that the district court erred in taking judicial notice of the social file fails.

11

Father also takes issue with a timeline that was attached to the motion to terminate parental rights, claiming that the district court erred in taking judicial notice of it. As the State points out, this argument is moot because the district court admitted the timeline as State's Exhibit 18, during the testimony of Castle, independent of judicial notice. Father also argues that the timeline would not be admissible as a business record, which is an exception to the prohibition on hearsay. See K.S.A. 2023 Supp. 60-460(m). But it does not appear that the district court admitted it as a business record. The district court basically ruled that the timeline was demonstrative evidence and that Castle, who prepared it, could be cross-examined about its accuracy and completeness. The district court did not err in admitting the timeline as State's Exhibit 18.

### WAS THE EVIDENCE SUFFICIENT TO SUPPORT THE DISTRICT COURT'S FINDINGS THAT FATHER WAS AN UNFIT PARENT?

Next, Father claims the evidence was insufficient to support the district court's findings that he was an unfit parent. Father asserts that he completed all of his case plan tasks, but SFM refused to increase his visits or focus on reintegration of J.J. with him. Father also argues for the first time on appeal that the district court erred in applying the presumptions of unfitness under K.S.A. 38-2271(a)(5) and (a)(13). The State contends that when viewed in the light most favorable to the State, clear and convincing evidence supports the district court's findings that Father was unfit by reason of conduct or condition that rendered him unable to properly care for his child.

"Termination of parental rights will be upheld on appeal if, after reviewing all the evidence in the light most favorable to the prevailing party, the district judge's fact-findings are deemed highly probable, i.e., supported by clear and convincing evidence." *In re Adoption of Baby Girl G.*, 311 Kan. 798, 806, 466 P.3d 1207 (2020). When reviewing these decisions, this court does not "weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact." 311 Kan. at 806.

12

Under K.S.A. 38-2269(a), to terminate a parent's rights, the State must prove "by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." The district court may rely on the list of nonexclusive factors in K.S.A. 38-2269(b)-(e) to determine whether a parent is unfit. See *In re E.L.*, 61 Kan. App. 2d 311, 323, 502 P.3d 1049 (2021). A single factor may be enough to terminate parental rights. K.S.A. 38-2269(f); 61 Kan. App. 2d at 323. Termination requires evidence of unfitness in the present and the foreseeable future. K.S.A. 38-2269(a); 61 Kan. App. 2d at 323.

Here, the district court found Father unfit based on five statutory factors under K.S.A. 38-2269(b) and (c):

1. K.S.A. 38-2269(b)(7) (failure of reasonable efforts made by agencies to rehabilitate family);
2. K.S.A. 38-2269(b)(8) (lack of effort of parent to adjust circumstances, conduct, or conditions to meet needs of child);
3. K.S.A. 38-2269(c)(1) (failure to assure care of the child in parental home when able to do so);
4. K.S.A. 38-2269(c)(2) (failure to maintain regular visitation); and
5. K.S.A. 38-2269(c)(3) (failure to carry out reasonable plan approved by the court toward reintegration in the parental home).

*K.S.A. 38-2269(b)(7) (failure of reasonable efforts made by agencies to rehabilitate family)*

When terminating a parent's rights under K.S.A. 38-2269(b)(7), the court shall consider "failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family." This record shows that the agencies' efforts were reasonable.

13

SFM provided Father with case supervision, assistance with housing applications, bus passes, a mental health evaluation, and a drug and alcohol evaluation, as well as providing for the care of the minor child.

Father argues that the record is unclear as to what efforts SFM provided to Father. He asserts that "the agency noted he completed all of his case plan tasks but then refused to increase his visits." This is a misstatement of the facts. None of the caseworkers testified that Father completed all of his case plan tasks. Zocca testified that Father should not have been given more time with his daughter, regardless of the agency's difficulty in transporting the child and arranging the visits. Zocca stated that Father would cancel visitations "without any notice or without confirmation until the last minute."

The district court found that J.J. had never spent the night alone with Father in her life. It found Father did not maintain stable housing, did not complete therapy, and did not complete the parenting class until after a year of involvement in the case. It concluded that "the agency did what they could and I feel their efforts were reasonable in that regard."

In *In re M.H.*, 50 Kan. App. 2d 1162, 1173, 337 P.3d 711 (2014), this court found that a father's failure to take initiative to complete his case plan tasks was not the agency's fault. "'The purpose of the reasonable efforts requirement is to provide a parent the opportunity to succeed, but to do so the parent must exert some effort.'" *In re M.S.*, 56 Kan. App. 2d 1247, 1257, 447 P.3d 994 (2019). Father takes issue with the limited visitation he was given but fails to address why he missed or canceled so many opportunities. He also fails to address why it took him over a year to complete a parenting class or get a mental health evaluation. The evidence supports the district court's finding that reasonable efforts by appropriate agencies to rehabilitate the family had failed. A rational fact-finder could have found it highly probably that SFM provided

reasonable efforts for Father to succeed in working toward reintegration, but the biggest impediment was Father's lack of effort. We conclude there was sufficient evidence for the district court to find Father unfit under K.S.A. 38-2269(b)(7).

*K.S.A. 38-2269(b)(8) (lack of effort of parent to adjust circumstances, conduct, or conditions to meet the needs of child)*

K.S.A. 38-2269(b)(8) provides that "[i]n making a determination of unfitness the court shall consider . . . [the] lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child." The child was placed into State custody on June 16, 2021. Father had over two years to work on his case plan tasks before his rights were terminated on July 7, 2023.

Father argues the record is full of examples of him trying to adjust his circumstances to meet J.J.'s needs. He then highlights all his housing changes and employment changes as positive change. But this is evidence of his instability, as found by the district court. And this panel cannot reweigh evidence in Father's favor. See *In re M.S.*, 56 Kan. App. 2d at 1256.

Father relies on *In re B.B.*, No. 119,351, 2018 WL 5851582 (Kan. App. 2018) (unpublished opinion), which he states is "very similar." This court in *In re B.B.* reversed a finding of unfitness and termination of a father's parental rights holding that the evidence was insufficient to support the district court's findings. 2018 WL 5851582, at *4. The district court in *In re B.B.* supported its decision with four findings—(1) that the father did not "'demonstrate second order change' in his parenting skills," (2) that the child's behavior had deteriorated, (3) that there were previous allegations that the father physically abused the child's siblings, and (4) that the father remained married to the mother, who had relinquished her parental rights. 2018 WL 5851582, at *4. As to the first finding, this court concluded that it was vague, conclusory, and not in the case plan. As to

15

the second finding, this court concluded that the State "failed to explain why the deterioration was Father's fault." 2018 WL 5851582, at *5. As to the third finding, this court concluded that unsubstantiated allegations are not clear and convincing evidence of abuse. As to the fourth finding, this court concluded that no evidence showed that the father was ever told he needed to end his marriage with the mother to maintain his parental rights. 2018 WL 5851582, at *6.

*In re B.B.* is easily distinguished from this case. Here, Father was told that he needed to maintain stable employment and stable housing. He failed to do so. Father was told many times to complete a parenting class, but he failed to enroll until termination proceedings were already underway. Father did not complete all case plan tasks. The district court found that Father just recently obtained stable housing and employment, despite being involved in the case for two years. The district court found that there were "numerous visitation times with the father that were cancelled." The judge stated that "the failure to provide for stability and housing and a job until just recently [and] not being in therapy that was recommended and difficulty completing the parenting classes until the very end just shows to me a lack of priority on the father's part to step in and be a father."

Viewing the evidence in a light most favorable to the State, there was clear and convincing evidence of a lack of effort on Father's part to adjust his circumstances to meet J.J.'s needs. We conclude there was sufficient evidence to support the district court's finding that Father was unfit under K.S.A. 38-2269(b)(8).

*K.S.A. 38-2269(c)(1) (failure to assure care of the child in parental home)*

Father asserts that he had an appropriate home approved by SFM for home visits. He fails to mention that his home was obtained after termination proceedings had begun, and he was only in that home for one week before the last day of evidence presented at the termination hearing. Father also asserts that he "kept asking to have more time with

his daughter, but the agency . . . refused." This is contrary to the evidence. Zocca testified that Father never requested more visitation than the once per week he was receiving, and that Father struggled with attending the visits that were scheduled.

Father argues he was never provided the chance to care for J.J. in his home. This is also contrary to the evidence. The district court's ruling on this factor focused on Father's failure to provide for J.J. in any way before the case was filed. Father testified that he had some relationship with Mother and J.J. for a few months after J.J.'s birth but admitted that he never paid child support or provided Mother with any supplies to help care for her. We conclude there was sufficient evidence, in the light most favorable to the State, to support the district court's finding that Father was unfit under K.S.A. 38-2269(c)(1).

*K.S.A. 38-2269(c)(2) (failure to maintain regular visitation)*

Father asserts that he maintained "fairly consistent" visitation with J.J. This is contrary to the evidence. According to the timeline of visitation compiled by Castle, Father cancelled visitation 26 times between August 30, 2021, and September 23, 2022. Zocca testified there were times when Father canceled the visitation with no notice or without confirmation until the last minute. Selby, J.J.'s CASA, testified that visitation between Father and J.J. was inconsistent. Easton testified the same as Selby. She testified that "there were multiple occasions . . . where he would confirm [a visit] the day before and not attend the day of." Easton said Father did not communicate as to why visits were being missed. We conclude there was sufficient evidence for the district court to find Father unfit under K.S.A. 38-2269(c)(2).

*K.S.A. 38-2269(c)(3) (failure to carry out reasonable plan approved by the court toward integration into a parental home)*

Father included his arguments under K.S.A. 38-2269(c)(3) with his arguments under K.S.A. 38-2269(b)(7), above. To reiterate, Father claimed he completed all of his case plan tasks, and that the agency noted this completion but refused to increase his visits. Father misstates the facts. The district court's findings included:

1. Father had trouble keeping his visitation appointments, often canceling at the last minute.
2. Father would not have any contact with J.J. except for the efforts by the agencies.
3. Father's lack of funds made it difficult for him to ensure the child's needs were met.
4. Father failed to complete the case plan tasks before the termination proceedings.
5. Father did not maintain stable housing.
6. Father did not enroll in a parenting class until December 2022, more than a year after the case began.
7. Father never participated in the Infants and Toddlers program.
8. Father did not complete therapy as recommended.

Considering the evidence in the light most favorable to the State, a rational fact-finder could have found it highly probable that Father was unfit based on this factor. We conclude there was sufficient evidence for the district court to find Father unfit under K.S.A. 39-2269(c)(3).

18

*Statutory presumptions of unfitness*

The district court also found that Father was presumed unfit under K.S.A. 38-2271(a)(5) and (a)(13), and that he failed to rebut those presumptions. On appeal, Father does not challenge the sufficiency of the evidence supporting these findings. Instead, Father argues that the district court erred in interpreting and applying these statutory presumptions of unfitness. More specifically, Father argues that the district court erred in applying the statutory presumptions in K.S.A. 38-2271(a)(5) and (a)(13) without first determining whether they were K.S.A. 60-414(a) or K.S.A. 60-414(b) presumptions and, as a result, Father's procedural due process rights were violated.

As the State points out in its brief, Father did not raise this issue in district court. Constitutional issues cannot be raised for the first time on appeal. *In re A.S.*, 319 Kan. 396, 399, 555 P.3d 732 (2024). Supreme Court Rule 6.02(a)(5) (2024 Kan. S. Ct. R. at 36) states that an appellant's brief must begin each issue with "a pinpoint reference to the location in the record on appeal where the issue was raised and ruled on. If the issue was not raised below, there must be an explanation why the issue is properly before the court." The circumstances under which a court can opt to review an issue raised for the first time on appeal include:

> "'"(1) the newly asserted theory involves only a question of law arising on proved or admitted facts . . . ; (2) consideration of the theory is necessary to serve the ends of justice or to prevent [a] denial of fundamental rights"; or (3) the district court's judgment is correct for the wrong reason.'" *In re A.S.*, 319 Kan. at 399.

Father's brief does not argue that any exception applies, nor has he replied to the State's assertion that this issue is not preserved for appeal. The Kansas Supreme Court has warned that Supreme Court Rule 6.02(a)(5) will be strictly enforced, and litigants who fail to comply risk a ruling that the issue is improperly briefed and will be deemed

19

waived or abandoned. See *State v. Holley*, 315 Kan. 512, 524, 509 P.3d 542 (2022). Because Father has made no effort to comply with Supreme Court Rule 6.02(a)(5) to preserve this issue for appeal, we decline to address the merits of the claim. But we also point out that a single statutory factor of unfitness may be enough to terminate parental rights. K.S.A. 38-2269(f); *In re E.L.*, 61 Kan. App. 2d at 323. We have determined that the State presented clear and convincing evidence to support the district court's findings of Father's unfitness under five statutory grounds. Even if we disregard the district court's additional findings under K.S.A. 38-2271(a)(5) and (a)(13), we are convinced the State has met its burden to prove Father unfit by reason of conduct or conditions making him unable to care properly for his child. K.S.A. 38-2269(a).

### DID THE DISTRICT COURT ERR IN FINDING THAT FATHER'S UNFITNESS WAS BASED ON CONDUCT OR CONDITION UNLIKELY TO CHANGE IN THE FORESEEABLE FUTURE?

"After finding a parent is unfit to properly care for a child, the court must then determine whether there is clear and convincing evidence that the parent's conduct or condition of unfitness is unlikely to change in the foreseeable future. K.S.A. 38-2269(a)." *In re D.G.*, 319 Kan. 446, 459, 555 P.3d 719 (2024). The court may look to a parent's past conduct as an indicator of future behavior. *In re Price*, 7 Kan. App. 2d 477, 483, 644 P.2d 467 (1982). When assessing the foreseeable future, this panel must use "'child time'" as the measure. See *In re N.A.C.*, 299 Kan. 1100, 1106, 329 P.3d 458 (2014). The revised Kansas Code for Care of Children, K.S.A. 38-2201 et seq. recognizes that children experience time differently than adults, and that different perception typically requires a prompt, permanent disposition. K.S.A. 38-2201(b)(4); *In re M.B.*, 39 Kan. App. 2d 31, 45, 176 P.3d 977 (2008).

The district court referenced the fact that it should use child time as the measure, and that "[c]hildren experience the passage of time in a way that makes a month or a year seem considerably longer." The district court found that for half of J.J.'s life, there was no

relationship with Father. And during the case, Father struggled to take care of himself, let alone J.J. Based on Father's past history, the guardian ad litem did not believe Father's conduct of recent stability could be continued successfully. The district court found that Father "just hasn't been able to live up to the case plan tasks as was expected of him to this point."

As the State points out, the district court was not swayed by Father's 11th-hour change in behavior. After two years of visitation, Father still had not been approved for overnight visits and had not completed his case plan tasks. Considering the evidence in the light most favorable to the State, we conclude a rational fact-finder could have found it highly probable that Father's conduct or condition of unfitness was unlikely to change in the foreseeable future under K.S.A. 38-2269(a).

## DID THE DISTRICT COURT ABUSE ITS DISCRETION IN FINDING THAT TERMINATION WAS IN THE BEST INTERESTS OF THE CHILD?

After the district court makes a finding that a parent is unfit, the district court then must determine whether the termination of parental rights is in the child's best interests. See K.S.A. 38-2269(g)(1); *In re R.S.*, 50 Kan. App. 2d 1105, 1115, 336 P.3d 903 (2014). "K.S.A. 38-2269(g)(1) expressly identifies the physical, mental, and emotional health of the child as the primary factors a district court should consider in making its best-interests determination." *In re D.G.*, 319 Kan. at 461-62.

This court reviews the district court's best-interests determination for abuse of discretion. "A district court abuses its discretion if no reasonable person would agree with the district court, or the court premised its decision on a factual or legal error." *In re E.L.*, 61 Kan. App. 2d at 330. The party asserting the district court abused its discretion bears the burden of showing such abuse of discretion. *Bicknell v. Kansas Dept. of Revenue*, 315 Kan. 451, 466, 509 P.3d 1211 (2022).

The district court's findings on best interests consisted of the following:

> "[T]here is a bond with the mother and the child. The bond with the father is much less, and I recall from the testimony of the father if, I believe right, that it's something that after every visit needs to be worked on by the father because that bond fades between visits for lack of a better word."

Father argues that the district court's finding was cursory and insufficient. He likens his situation to the father in *In re T.H.*, 60 Kan. App. 2d 536, 494 P.3d 851 (2021), stating that he "has gone to great lengths to make changes in his circumstances to parent his minor child." In *In re T.H.*, the father was incarcerated and the State argued that his convictions alone were reason to terminate his rights. But even through his incarceration, the father maintained regular contact with his son. This court found that the father had a "very close father-son relationship with T.H." and before his incarceration "had never been away from T.H. for longer than two weeks." 60 Kan. App. 2d at 544-45. This court reversed the termination, finding that "Father has completed every task requested, has provided physically, emotionally, and financially for T.H., and has maintained regular contact. . . . All agree there is a strong bond between the two." 60 Kan. App. at 559. Here, Father had never even had one single overnight visit on his own with J.J. for her entire life and had at most seen her for a few hours once a week after the case was filed. No one testified that Father and J.J. had a close bond. Father's situation is remarkably different from the father in *In re T.H.*

There was ample evidence presented to the district court that Father was unable to maintain stable housing and employment, and that he struggled with visitation. The district court found that Father's failure to complete basic case plan tasks until after termination proceedings began proved that reintegration with his child was not a priority for Father. Father has not alleged that the district court's conclusion was based on any factual or legal error, and a reasonable person could agree with it. Father has failed to

22

show that the district court abused its discretion in finding that termination of Father's parental rights was in the best interests of the child.

Affirmed.